IN THE SUPREME COURT OF NORTH CAROLINA

No. 86A23-2

Filed 14 August 2026

DOUG TURPIN and NICOLE TURPIN

v.

CHARLOTTE LATIN SCHOOLS, INC.; CHARLES D. BALDECCHI; TODD BALLABAN; DENNY S. O'LEARY; MICHAEL D. FRENO; R. MITCHELL WICKHAM; COURTNEY HYDER; IRM R. BELLAVIA; PHIL COLACO; JOHN D. COMLY; MARY KATHERINE DUBOSE; ADAORA A. ERUCHALU; DEBBIE S. FRAIL; DON S. GATELY; ISRAEL K. GORELICK; JOY M. KENEFICK; KARIM LOKAS; JOHN T. MCCOY; KRISTIN M. MIDDENDORF; A. COY MONK IV; UMA N. O'BRIEN; DAVID A. SHUFORD; MICHELLE A. THORNHILL; FLETCHER H. GREGORY III; TARA LEBDA; and PAIGE FORD.

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 293 N.C. App. 330 (2024), affirming an order granting defendants' motion to dismiss plaintiffs' complaint entered on 13 October 2022 by Judge Lisa C. Bell in Superior Court, Mecklenburg County. Heard in the Supreme Court on 29 October 2025.

*Ward and Smith, P.A., by Christopher S. Edwards, Alex C. Dale, and Alexandra E. Ferri; and Vogel Law Firm PLLC, by Jonathan A. Vogel, for plaintiff-appellants.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Kimberly M. Marston, Jim W. Phillips Jr., Jennifer K. Van Zant, and William A. Robertson, for defendant-appellees.*

*Dowling PLLC, by Troy D. Shelton, for Richard Hudson, Pat Harrigan, Brad Overcash, Dana Jones, W. Ted Alexander, Amy S. Galey, David Willis, Celeste C. Cairns, Grant L. Campbell, Brian Echevarria, Neal Jackson, Keith Kidwell, Heather H. Rhyne, Coalition for Liberty, Moms for Liberty, American Center for Education and Knowledge, Color Us United, Future Prep Educational Services,*

*National School Boards Leadership Council, New Tolerance Campaign, Our Duty, The Palm Beach Freedom Institute, The Patriots Business Alliance, United Families International, and Advocates for Faith & Freedom, amici curiae.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Christopher G. Smith, B. Davis Horne Jr., Michael W. Mitchell, and Jang H. Jo, for North Carolina Association of Independent Schools and the Southern Association of Independent Schools, amici curiae.*

*Troutman Pepper Locke LLP, by Joshua D. Davey, for the Roman Catholic Diocese of Charlotte, North Carolina, amicus curiae.*

DIETZ, Justice.

Once again, we are confronted with a case where the factual allegations "concern matters that are controversial in contemporary politics" but where the legal issues "are so time-tested that they border on mundane." *Kinsley v. Ace Speedway Racing, Ltd.*, 386 N.C. 418, 420 (2024).

According to the complaint in this case, Plaintiffs Doug and Nicole Turpin sent their children to a private school called Charlotte Latin School. Beginning in the summer of 2020, the school began to change its curriculum to focus on politicized issues of race and gender identity. At some point, the Turpins learned that the school was teaching their sixth-grade child various polarizing concepts such as "Republicans are white supremacists." The school also required young students to read books on sexuality and gender identity that were not age appropriate.

The Turpins started organizing with other parents to voice their concerns about the school curriculum in 2021. Eventually, the Turpins scheduled a meeting

with school leadership. At the meeting, the school was not interested in discussing the Turpins' concerns. Instead, the school terminated the Turpins' enrollment contracts and expelled their children with no advance warning. The school also falsely accused the Turpins of making racist comments about non-white students and faculty. The Turpins responded by bringing this lawsuit, alleging a long list of claims including breach of contract, fraud, unfair and deceptive trade practices, and defamation.

The subject matter of this lawsuit no doubt touches on divisive topics in contemporary social discourse. But none of those divisive topics have any bearing on the legal issues before this Court today. Our task is to determine if the Turpins' complaint satisfies the "notice pleading" standard that applies in civil cases. *Pyco Supply Co. v. Am. Centennial Ins. Co.*, 321 N.C. 435, 442 (1988). That well-settled standard requires the complaint to contain a "short and plain statement" sufficient to notify the defendants of "the events or transactions which produced the claim." *Id.* When reviewing a complaint under this standard, courts must take all the allegations as true and cannot grant a motion to dismiss unless it "appears *certain* that plaintiffs could prove no set of facts which would entitle them to relief." *Howell v. Cooper*, 388 N.C. 71, 78 (2025).

Applying that standard here, the Turpins have alleged a number of claims that meet the notice pleading requirements and cannot be dismissed at this early stage of the case. Now, to be fair, the Turpins' complaint is far from a "short and plain

statement." The sixty pages of allegations occasionally resemble a press release more than a legal filing. This likely complicated the lower courts' review because many portions of the complaint assert claims or legal theories that are meritless as a matter of law and were properly dismissed.

But, as explained in more detail below, when we take the allegations in the complaint as true, the Turpins have alleged a narrow set of facts that, if proven, properly state claims for breach of contract, fraud, unfair and deceptive trade practices, and defamation. We therefore reverse the decision of the Court of Appeals and remand the case so that the Turpins can proceed on this more limited set of properly pleaded claims.

**Facts and Procedural History**

Our factual discussion throughout this opinion is based on the allegations in the complaint. Under the applicable standard of review, we must take these unproven allegations as true for purposes of our review. *Jones v. J. Kim Hatcher Ins. Agencies, Inc.*, 387 N.C. 489, 492 (2025).

Plaintiffs Doug Turpin and Nicole Turpin have two children who attended Charlotte Latin School for a number of years. Until the 2020–2021 school year, Charlotte Latin offered a traditional, "apolitical" curriculum focused on classical education.

That changed after the death of George Floyd and the racial justice movement that followed in the summer of 2020. At that point, the school began to focus its

attention and curriculum on the "continued marginalization of Black Americans" and the need to "prioritize racial equity." School leaders suggested that the school had roots in racism and sent a letter to parents stating that it had heard "about injustices experienced by students of color and about the shame felt by white students."

The Turpins saw the effects of these changes in the classroom. In a sixth-grade humanities class, the teacher taught students that "Republicans are white supremacists" and pressured the Turpins' child to believe "what Republicans stand for is racial suppression and white supremacy in action."

The new curriculum also expanded beyond the intense focus on divisive racial issues. Students of every age were told to choose their preferred pronouns, and even young children were required to read books and poems about "homosexuality and transgenderism that were pornographic and/or not age appropriate."

Eventually, a group of concerned parents formed "Refocus Latin," an informal organization to push for changes to the school curriculum. The Turpins were founding members of Refocus Latin. The group asked to make a presentation to Charlotte Latin's Board of Trustees. The board agreed to meet with ten parents from the group and listen to their concerns. Before and during the meeting, members of the board repeatedly assured the group that "no parent who raises concerns about Latin's curriculum and culture will be subjected to retaliation and that any parent who participates in the presentation would be even more protected from being subjected to retaliation." The ten parents, including Doug Turpin, then gave the presentation,

which described "specific and serious concerns that Latin had changed its curriculum and culture to comport with views associated with a political agenda."

Immediately after the presentation, Charlotte Latin told the group of parents that neither the Board of Trustees nor the school's administrators would have any further discussions with the group about the matters raised in the presentation. Instead, the school said parents must meet individually with school administrators to discuss any concerns with their children's education.

The Turpins later emailed school administrators requesting a meeting to discuss specific concerns with their sixth-grader's humanities class. In the email, the Turpins explained that they did not want their child to experience "any possible blowback because of what we are bringing to your attention." A school administrator responded that "there will be no blowback, I assure you."

A few days later, Doug Turpin went to Charlotte Latin to meet with school leadership. Defendant Charles Baldecchi, Charlotte Latin's "Head of School," and Defendant Todd Ballaban, Charlotte Latin's "Head of Middle School," attended the meeting. After allowing Turpin to briefly discuss concerns about the sixth-grade humanities class, Baldecchi accused Turpin and the other Refocus Latin parents of displaying a PowerPoint document that included the racist statement that students and faculty of color at Charlotte Latin are "not up to the merit of the school." The PowerPoint presentation did not contain this statement.

Baldecchi then took out copies of the children's enrollment agreements and told

Turpin that Charlotte Latin was terminating the children's enrollment and expelling them effective immediately. Baldecchi told Turpin that the children must leave Charlotte Latin by the end of the day and were prohibited from ever returning.

Several days later, Charlotte Latin sent an email to all parents, students, faculty, and staff accusing the Turpins and the other parents involved in the Refocus Latin presentation of making racist statements that "diverse students and faculty have not earned their positions and honors at Latin." Neither Turpin nor any other parent made these statements at the meeting, and the presentation itself did not include those statements.

The Turpins later brought this action against Charlotte Latin, Baldecchi, Ballaban, and the members of the school's board of trustees. The complaint alleged breach of contract, fraud, unfair and deceptive trade practices, defamation, and a number of other related claims. The defendants moved to dismiss all claims under Rule 12(b)(6) for failure to state a claim on which relief can be granted.

The trial court granted the motion with respect to every claim except breach of the implied covenant of good faith and fair dealing. The Turpins then voluntarily dismissed that sole surviving claim and appealed the trial court's order.

On appeal, a divided panel at the Court of Appeals affirmed the trial court's order. *Turpin v. Charlotte Latin Schs., Inc.*, 293 N.C. App. 330 (2024). The Turpins filed a notice of appeal based on the dissent, and we allowed discretionary review to

examine additional issues that were not the basis for the dissenting opinion.[1]

## Analysis

### I.      Standard of review

We begin our analysis with the standard of review. This case is before us on Charlotte Latin's motion to dismiss under Rule 12(b)(6) of the Rules of Civil Procedure. N.C.G.S. § 1A-1, Rule 12(b)(6) (2025). In that motion, Charlotte Latin argued that the Turpins' lengthy, multi-count complaint failed to state any claim on which relief can be granted. We therefore start our discussion with the pleading requirements necessary to satisfy Rule 12(b)(6).

Under the Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief." *Id.* Rule 8(a)(1). Courts refer to this as the "notice pleading" standard. *Pyco*, 321 N.C. at 442.

Notice pleading is a "liberal" rule, not a "hyper-technical" one. *Howell*, 388 N.C. at 77. "At the Rule 12(b)(6) stage, a court must take the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Jones*, 387 N.C. at 492 (cleaned up). Treating those allegations as true, a complaint "complies with the rule if it gives sufficient notice of the events or transactions which produced the claim

---

[1] The Turpins filed their notice of appeal before the repeal of N.C.G.S. § 7A-30(2) (2023), which authorized an appeal by right based on a dissenting opinion at the Court of Appeals. *See Durham Green Flea Market v. City of Durham*, 388 N.C. 543, 548 (2025).

to enable the adverse party to understand the nature of it and the basis for it, to file a responsive pleading, and—by using the rules provided for obtaining pretrial discovery—to get any additional information he may need to prepare for trial." *Howell*, 388 N.C. at 77 (cleaned up).

"To that end, a plaintiff does not have to prove his case at the pleading stage, and few complaints fail to survive a motion to dismiss under Rule 12(b)(6)." *Id.* at 78 (cleaned up). "Dismissal under Rule 12(b)(6) is warranted only when (1) it appears *certain* that plaintiffs could prove no set of facts which would entitle them to relief under some legal theory; (2) *no* law exists to support the claim made; or (3) the complaint on its face discloses facts that *necessarily* defeat the claim." *Id.*

This notice pleading standard is nothing new; it is so well-settled in our state's jurisprudence that repeating it in full, as we have done above, can feel excessive. But one portion of the rule, although well-settled in Court of Appeals jurisprudence, has never been expressly endorsed by this Court. That portion concerns what constitutes the "complaint" for purposes of review under Rule 12(b)(6). As noted above, the "function of a motion to dismiss is to test the law of a claim, *not the facts which support it.*" *Id.* For this reason, review at the Rule 12(b)(6) stage is typically limited to the so-called "four corners" of the complaint. *Blue v. Bhiro*, 381 N.C. 1, 3 (2022). If, in a Rule 12(b)(6) motion, the movant includes evidence outside the four corners of the complaint, and that evidence is not excluded by the court, the motion is converted into a summary judgment filing and must comply with Rule 56. N.C.G.S. § 1A-1, Rule

12(b); *see also Blue*, 381 N.C. at 6.

But this Court has long held that the "four corners" of the complaint can extend beyond the limits of the complaint itself and reach documents that are "central to the claim" and "attached to the complaint and incorporated therein by reference." *Mauck v. Cherry Oil Co., Inc.*, 388 N.C. 325, 332–33 (2025) (cleaned up). In *Mauck*, it was a contract attached to the complaint. But we have acknowledged the same is true for other documents central to an asserted claim, including wills and other instruments, and copies of legal filings from other lawsuits. *See, e.g.*, *Ladd v. Est. of Kellenberger*, 314 N.C. 477, 480, 482 (1985); *Stanback v. Stanback*, 297 N.C. 181, 205 (1979). Simply put, we have long held that if a document is central to a claim and is attached to the complaint, it can be considered as part of the "four corners" of the complaint for purposes of Rule 12(b)(6).

This is straightforward enough, but it raises a follow-up question: What if a document is central to a claim, referenced in the allegations, but *not* attached to the complaint? The Court of Appeals has long held that these documents, too, are properly considered under Rule 12(b)(6). *See Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60–61 (2001). So long as the document's authenticity is not disputed, "a court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Id.*; *see also Holton v. Holton*, 258 N.C. App. 408, 419 (2018); *Robertson v. Boyd*, 88 N.C. App. 437, 441 (1988); *Coley v. N.C. Nat'l Bank*, 41 N.C. App. 121, 126

(1979).

This accords with the approach in the federal courts. "Under the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) the plaintiff refers to certain documents in the complaint, (2) those documents are central to the plaintiff's claim, and (3) the documents' contents are undisputed." *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023) (cleaned up); *see also Friedman v. AARP, Inc.*, 855 F.3d 1047, 1051 (9th Cir. 2017); *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013). This means that, so long as the document is "integral to the complaint and there is no dispute about the document's authenticity," a court can examine the document at the Rule 12(b)(6) stage and even "credit the document over conflicting allegations in the complaint." *Doriety ex rel. Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024) (cleaned up).

We take this opportunity to expressly endorse this incorporation-by-reference rule long followed by our Court of Appeals and federal courts. Under the North Carolina Rules of Civil Procedure, a court reviewing a motion to dismiss under Rule 12(b)(6) may consider a document submitted by the movant if (1) the document is referenced in the complaint; (2) the document is central to the factual allegations or the claims asserted; and (3) there is no dispute about the document's authenticity. With this standard of review in mind, we now turn to the lengthy list of claims asserted in this complaint.

## II.     Breach of contract

We begin with the Turpins' breach of contract claim. The pleading requirements for a contract claim are among the most well-settled in the entire body of state common law. A complaint sufficiently states a claim for breach of contract if it alleges "(1) the existence of a contract between plaintiff and defendant, (2) the specific provisions breached, (3) the facts constituting the breach, and (4) the amount of damages resulting to plaintiff from such breach." *Intersal, Inc. v. Hamilton*, 373 N.C. 89, 108–09 (2019) (cleaned up).

Here, the crux of this contract claim is a termination clause permitting Charlotte Latin to end enrollment if one of two contractual criteria is satisfied. As noted above, because the Turpins alleged the existence of a written contract, that contract is incorporated into the complaint and can be considered at the pleading stage when reviewing a Rule 12(b)(6) motion to dismiss. *Oberlin Cap.*, 147 N.C. App. at 60.

The termination provision permits Charlotte Latin to "discontinue enrollment" whenever it determines that one of two criteria is satisfied: (1) a parent's actions make a "positive, collaborative working relationship" with the school impossible or (2) the parent's actions "seriously interfere" with the school's mission:

> A positive, collaborative working relationship between the School and a student's parent/guardians is essential to the fulfillment of the School's mission. Therefore, the School reserves the right to discontinue enrollment if it concludes that the actions of a parent/guardian make such a relationship impossible or seriously interfere with the

-12-

School's mission.

The Turpins allege that the school violated this termination provision and, as a result, breached the contract. Their factual allegations are straightforward: Charlotte Latin *claimed* to be expelling the students under this termination clause because the Turpins made a collaborative relationship impossible or were seriously interfering with the school's mission. But, according to the complaint, Charlotte Latin didn't actually *believe* that. The Turpins allege that the school decided to expel their children for reasons that were not permitted by the contract and then used the contractual grounds as a false pretext.

Importantly, even Charlotte Latin concedes that, if this were true—that is, if the school acted under a false pretext—it would be a breach of the contract. In their briefing, the school acknowledged that the Turpins could state a claim based on "allegations of some improper pretext on Latin's part—such as an attempt to get out of a bad deal." And at oral argument, Charlotte Latin again conceded that the termination clause "may not be invoked with a pretext or in bad faith."

This is precisely what the complaint alleges. The Turpins contend that the school acted under a false pretext and knew that the termination criteria were not actually satisfied. That is the core factual theme of the Turpins' lengthy complaint— they allege that Charlotte Latin knew the Turpins were being collaborative and respectful and knew that their views did not interfere with the mission of a school whose very name invokes a focus on the classical traditions of discourse, rationality,

and critical thinking. But, the Turpins allege, the school was determined to retaliate against them for other reasons and used the contractual grounds as the false pretext to do so.

Notably, these are not stray remarks that might be overlooked by a reader. Indeed, 18 times throughout the complaint, the Turpins allege that Charlotte Latin's purported basis for expelling the children was "pretextual" or a "pretext" and not based on the grounds set out in the contract. It is the entire focus of the complaint. The Turpins support it with specific factual allegations about their respectful conduct, the school's history and values, its more recent embrace of what the complaint labels "cancel culture," and various other facts from which the possible wrongful motives of school leadership can be inferred.

Thus, under the "notice pleading" standard described above, the Turpins have stated a claim that moves past the pleading stage. *Pyco*, 321 N.C. at 442. We can dismiss the complaint only if it "appears *certain* that plaintiffs could prove no set of facts which would entitle them to relief." *Howell*, 388 N.C. at 78. Here, if the Turpins prove the school acted under a false pretext, they will prevail on their claim. Thus, they have satisfied the notice pleading requirements.

This is where both the Court of Appeals majority and our dissenting colleagues reach an inflection point with the well-settled notice pleading standard. They are compelled to demand more of the Turpins than is required for any other claimant. Take, for example, the dissent's insistence that "neither the complaint nor the

majority is clear what impermissible reason the alleged pretext masked."

Of course, the Turpins cannot yet know the real reason behind the pretext. How could they? Are they mind-readers? Or does the dissent truly believe the only way this sort of claim moves forward is if the school said: "We're expelling your kids under the contract but that's just a false pretext. Here's the real reason for you to include in your lawsuit."

This is precisely why these types of factual allegations, concerning something in the mind of the defendant, cannot be fully explained at the pleading stage. *See* N.C.G.S. § 1A-1, Rule 9(b). Instead, "intent, knowledge, and other condition of mind of a person may be averred generally." *Id.* That is what the Turpins did here.

It is worth noting, as well, that the complaint *does* contain many possible explanations for the false pretext. At this point, these are all reasonable inferences from the allegations because, again, the Turpins cannot know for certain the true reasons in the minds of the defendants (nor are they expected to). *See id.* But to point out just one obvious explanation contained in the complaint, look to its introduction. The Turpins allege that the school was infected by "what has come to be known in American society as 'cancel culture.'" They further allege that they chose to stand up to that "cancel culture" movement and formed the Refocus Latin group to challenge it. One can readily infer from the complaint that one possible reason for the school's pretext was that leadership had to "cancel" the Turpins, as they allege, because school officials were fearful that if they didn't find a way to cancel the Turpins, they might

-15-

be canceled themselves.

The impossible mind-reading demanded from our dissenting colleagues is not the only bizarre part of their reasoning. Take, for example, the dissent's insistence that "the contract did not prohibit pretextual termination, as long as Charlotte Latin believed in its sole discretion that the parent-school relationship was untenable." If the school believed the relationship was untenable, then that reason isn't pretextual, it's an actual, permissible reason.

This weird, circular logic gets at another fallacy. Both the Court of Appeals majority and our dissenting colleagues are convinced that Charlotte Latin had a right to "unilateral termination" essentially whenever the school wanted and should never have to prove the contractual grounds existed. We have acknowledged that parties can include this type of unilateral provision in a contract. *Canteen v. Charlotte Metro Credit Union*, 386 N.C. 18, 25 (2024). In *Canteen*, for example, the contract permitted the defendant to "change the terms of this Agreement" at any time. *Id.* at 20. No strings attached. Charlotte Latin could have included a similar termination clause in the enrollment contract. It didn't. Instead, the contract limits the school's "unilateral" ability to terminate to situations where one of the two contract conditions is satisfied. The Turpins are entitled to the benefit of that bargain. *See Fulcher v. Nelson*, 273 N.C. 221, 224 (1968).

All of this is a rather long way of saying that this claim boils down to a single straightforward allegation. As Charlotte Latin conceded in open court, the school's

right to terminate the Enrollment Agreement "may not be invoked with a pretext or in bad faith." In the complaint, the Turpins expressly alleged that the school invoked those grounds as a pretext and provided factual allegations to support many possible inferences about the school's true motives behind the false pretext. That is enough to state a claim for breach of contract. At this stage of the case, we must "construe the complaint liberally" and "treat the complaint's factual allegations as true." *Howell*, 388 N.C. at 78. Taking as true the Turpins' allegation that the school was acting under a false pretext, the complaint adequately alleges that Charlotte Latin breached the plain terms of the contract. *See Intersal*, 373 N.C. at 108–09.

In addition to this pretext theory, the complaint also alleges other contract theories that do not state a claim on which relief can be granted. These include the theories that the Turpins had a "contractually-protected right to respectfully communicate" with the school and had a contractual right to "notice" or "an opportunity to be heard" before the school expelled their children.

The contract does not contain these rights. By its plain terms, the contract permits Charlotte Latin to terminate enrollment whenever the school determines that a parent's actions make a positive, collaborative working relationship impossible or seriously interfere with the school's mission. It is not limited to parental actions that are disrespectful and does not require the school to offer any advance notice or process before terminating enrollment. These are certainly contract terms that *could* be bargained for and included in a private school enrollment agreement. They are not

terms in this contract.

In sum, the Turpins have stated a valid claim for breach of contract based on the theory that Charlotte Latin's motives were pretextual. As the case progresses, the Turpins will, of course, have to put forth evidence that Charlotte Latin's motives were pretextual. They cannot rest on allegations alone. But that is a question for another day, after the parties have an opportunity to conduct discovery. At this early stage of the case, the Turpins have satisfied the requirement to plead a claim on which relief could be granted, and the Court of Appeals erred by holding otherwise. *See Howell*, 388 N.C. at 78.

### III. Fraud

Next, we examine the Turpins' fraud claim. Again, the pleading requirements for common law fraud are well-settled in this state. To bring a claim for fraud, a plaintiff must allege a "(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 526–27 (2007) (cleaned up). Rule 9 of the Rules of Civil Procedure also imposes special "particularity" pleading requirements for fraud claims. N.C.G.S. § 1A-1, Rule 9(b). The "particularity requirement is met by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 263 (2023).

Here, the complaint alleges that Charlotte Latin promised the Turpins there would be no "blowback" or "retaliation" against them or their children if they met with school leadership to discuss their concerns; that this promise was false and, from the beginning, Charlotte Latin intended to deceive the Turpins and lure them to the meeting in order to create a pretext for expelling the children; that the Turpins believed Charlotte Latin's promise and spoke openly about their concerns because they believed the school would not use those discussions as the pretextual grounds to expel the children; that the school, in that same meeting, expelled the children, as they intended from the outset, despite promising the Turpins they would not do so; and that the school's deceit caused significant damage to the Turpins.

Again, as with the contract claim, these allegations on their face satisfy the requirements of notice pleading. They cover each of the essential elements of the claim and meet the particularity requirements of a fraud claim by alleging who made the fraudulent statement, when it was made, where it was made, how it was reasonably calculated to deceive, why the Turpins reasonably relied on it, and the harm that resulted. *See id.* at 263.

But, much like the contract claim, the Court of Appeals held that the claim was subject to dismissal by looking beyond the pleadings. Specifically, the Court of Appeals examined the emails that contained the allegedly fraudulent statements. As noted above, because those emails form the basis of the fraud claim and are expressly referenced in the complaint, the emails are incorporated by reference into the

complaint and can be examined at the pleadings stage when reviewing a Rule 12(b)(6) motion to dismiss. *Oberlin Cap.*, 147 N.C. App. at 60.

The Court of Appeals held that facts disclosed in the emails necessarily defeated the fraud claim. The court explained that the allegedly fraudulent statement is contained in a series of emails where the Turpins asked to meet school leadership to discuss the curriculum for one of their children's classes. *Turpin*, 293 N.C. App. at 344. The allegedly false statement is this sentence in a response email from Charlotte Latin to the Turpins: "Our teachers do not retaliate and there will be no blowback, I assure you."

This statement, according to the Court of Appeals, only promised no "blowback from *the teacher* towards plaintiffs' child." *Id.* (emphasis added). That blowback from the teacher did not occur, the court reasoned, because the child's "removal from the school was an *ancillary effect* of the termination of the enrollment contract *between plaintiffs and defendants*," not a retaliatory action by "a teacher." *Id.* at 344–45.

This reasoning turns the standard of review on its head. "When reviewing a Rule 12(b)(6) motion, we treat the complaint's factual allegations as true and view them in the light most favorable to the plaintiff." *Howell*, 388 N.C. at 78. Viewed in the light most favorable to the Turpins, the promise of no "blowback" contained in the email is not nearly as narrow as the Court of Appeals interpreted it. Instead, that promise of "no blowback" plainly included a promise not to terminate the Turpins' enrollment contract and kick the child out of school.

This discussion began with the Turpins emailing school leadership about one of their children, a sixth grader taking a humanities class. The Turpins explained that the humanities teacher taught the students that "Republicans are white supremacists" and that "what Republicans stand for is racial suppression and white supremacy in action." The Turpins also recounted many other "left wing progressive" topics in the course that they believed were wrongly politicized and inappropriate for a sixth grader. When asking to meet with school leadership to discuss their concerns, the Turpins emphasized that they did not want their child "to experience any possible blowback because of what we are bringing to your attention":

> I wanted to discuss with you a situation that is of serious concern to Nicole and I at your convenience. I would prefer that we discuss this situation on a call, before you address this with the teacher I am referencing in this email. We do not want [our child] to experience any possible blowback because of what we are bringing to your attention.

In response to this email, the school stated that its teachers "do not retaliate" and that "there will be no blowback, I assure you":

> Thank you for the email. You make some serious claims that I need to investigate with the teacher, which is only fair so she can provide context. Our teachers do not retaliate and there will be no blowback, I assure you. Please give me a day or two to look into it and will get back to you shortly.

It is entirely reasonable to view the meaning of the term "no blowback" in this context to mean *more* than just retaliation by the teacher in the classroom. After all, the school's email expressly assured the Turpins *both* that there would be no

retaliation from the teacher *and* that there would be no blowback, which a reasonable person certainly could interpret as being two separate things. But even more fundamentally, in ordinary English usage, when parents want to discuss a sensitive topic with school administrators but caution that they do not want their child to "experience any possible blowback because of what we are bringing to your attention," and the school administrator responds with "there will be no blowback, I assure you," it is quite reasonable to understand the assurance of "no blowback" to include terminating the child's enrollment at school. Thus, when we properly apply the standard of review and view this allegation and all its reasonable inferences in the Turpins' favor, not the school's, the assurance went beyond a promise of no blowback from the teacher alone. *See id.*

It is worth noting here that proving the elements of this claim will be a daunting task. The Turpins allege that the school falsely promised them no blowback "in order to lure" the Turpins to the meeting where they could use the Turpins' discussion as the pretext to justify an expulsion decision that the school had already made.

But from the other allegations in the complaint, there were already many actions by the Turpins that could have functioned as that alleged "pretext," such as the Refocus Latin presentation or the Turpins' emails to administrators. It is quite odd that the school would find these other grounds insufficient; that, instead, the school would feel compelled to construct an elaborate lie to "lure" the Turpins to a

meeting where they could obtain the necessary pretext for the decision to expel the children.

Our dissenting colleagues fixate on this issue, pointing out Doug Turpin could not have relied on their fraud "since Charlotte Latin could terminate his children's enrollments regardless of whether he attended the meeting." But again, the Turpins allege otherwise; they contend that the school did not have any sincere grounds to terminate the contract when they lured the Turpins to the meeting to create the false pretext.

This is where the standard of review comes into perhaps its starkest focus. In federal court, this fraud claim might well be dismissed. Two decades ago, the federal courts moved away from the notice pleading test we use in state court today—in particular, the principle that a claim survives a Rule 12(b)(6) motion unless "it appears *certain* that plaintiffs could prove no set of facts which would entitle them to relief under some legal theory." *See Howell*, 388 N.C. at 78. Instead, federal courts use what is often called the *Twombly/Iqbal* standard, named for the cases adopting the test. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). That test requires the plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The allegations must "permit the court to infer more than the mere possibility of misconduct" based on the court's "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "At bottom, a plaintiff must nudge its claims across the line from conceivable to plausible to resist

dismissal." *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (cleaned up).

The Turpins' fraud claim might fail this test. Is it *conceivable* that the Turpins will prove Charlotte Latin needed this complicated fraud to manufacture the necessary pretext? Yes, it is *conceivable*. But it is incredibly unlikely and thus may not be enough to nudge the claim across the line to plausibility. *See id.* So, if this claim were filed in federal court, it might be dismissed.

It is strange that both federal law and state law use almost exactly the same language in their pleading rules but there could be such a stark difference in outcomes. *Compare* Fed. R. Civ. P. 8, 12, *with* N.C.G.S. § 1A-1, Rules 8, 12. In an appropriate case, this Court might examine the resulting tension and whether our state law should evolve to avoid this outcome in the future. But defendants did not ask us to do so here, nor did the defendants in other recent cases where we have restated the familiar "no set of facts" standard. *See Howell*, 388 N.C. at 78. We must therefore apply that existing standard here. Doing so, the Turpins have pleaded facts that, if proven, satisfy all the elements of a fraud claim. *See id.*

We emphasize, as we did with the breach of contract claim, that the Turpins ultimately will have to put forth evidence for these allegations, including evidence that the school was lying from the beginning, that it lured the Turpins to the meeting to create the necessary pretext to cover up its wrongful motives, and so on. But at this early stage of the case, the Turpins have satisfied the requirement to plead facts

that, if proven, support a claim on which relief could be granted. *See id.*

In its briefing, Charlotte Latin also raises an alternative argument not embraced by the Court of Appeals. The school contends that, even if the "no blowback" statement encompasses termination of the child's enrollment at the school, that statement was a "forward-looking statement about the future that is not a 'misrepresentation' of an existing fact."

Charlotte Latin is correct that forward-looking statements often cannot constitute fraud. "As a general rule, a mere promissory representation will not be sufficient to support an action for fraud." *Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 255 (1980). This sort of forward-looking statement becomes fraudulent only if "the promisor, at the time of making it, has no intent to comply." *Id.*

But again, this is precisely what the Turpins allege here. They allege that school administrators knew the "no blowback" promise was false when they made it. That misrepresentation, according to the Turpins, was part of "creating a pretext." It was designed to lure the Turpins to the meeting and induce them to discuss their concerns, so that the school could use those discussions as a sort of pretextual cover story to justify a decision the school had already made for improper reasons. Taking these allegations as true, the Turpins properly pleaded a claim on which relief can be granted.

Charlotte Latin also makes a few other pleading arguments not addressed by the Court of Appeals. First, the school argues that the Turpins inadvertently "plead

themselves out of showing reliance" by alleging that they "had already requested the meeting" with school administrators before receiving the false assurance that there would be no blowback. Second, the school argues that the complaint fails to allege "that the meeting itself or anything that happened during the meeting gave rise to the termination of the Enrollment Agreements."

These arguments, once again, do not view the complaint in the light most favorable to the Turpins. With respect to the request to meet with school leadership, Charlotte Latin ignores that the Turpins expressed reservations about potential "blowback" in the same email requesting a meeting. The complaint alleges that the Turpins only agreed to attend the meeting *after* receiving the school's assurance that there would be no blowback.

Likewise, with respect to the argument that nothing in the meeting gave rise to terminating the children's enrollment, the complaint alleges that the school lured the Turpins to that meeting to create a pretext for terminating the agreement and that the children would not have been expelled had the Turpins not been deceived into attending.

At the risk of tedious repetition, we emphasize—once again—that at this stage of the proceeding we must take these allegations as true. *Howell*, 388 N.C. at 78. When we do so, the Turpins have properly pleaded with particularity all the essential elements of a fraud claim. We therefore reverse the decision of the Court of Appeals with respect to this claim and remand for further proceedings.

## IV.    Unfair and deceptive trade practices

We turn next to the unfair and deceptive trade practices claim under Chapter 75 of the General Statutes. This is a statutory claim and, as with its common law counterparts, it has a solid body of case law establishing its pleading requirements. To plead a valid claim, "a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *SciGrip, Inc. v. Osae*, 373 N.C. 409, 426 (2020).

When reviewing an unfair and deceptive trade practices claim, the complaint "must first establish that defendants' conduct was 'in or affecting commerce' before the question of unfairness or deception arises." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592 (1991). Here, neither the lower courts nor Charlotte Latin assert that the alleged conduct was not "in or affecting commerce." This is because the statute broadly defines "commerce" as "all business activities." N.C.G.S. § 75–1.1(b). "Business activities" are an organization's "regular, day-to-day activities, or affairs" and include the activities of non-profits that charge fees for a service. *HAJMM*, 328 N.C. at 594; *see Davis Lake Cmty. Ass'n, Inc. v. Feldmann*, 138 N.C. App. 292, 296 (2000). Thus, the allegations in the complaint, which concern the regular activities of a private school that charges fees in exchange for its educational services, are "in or affecting commerce" under the statutory definition. *Id.*

Next, we examine whether the complaint alleges an "unfair or deceptive act or

practice." *SciGrip*, 373 N.C. at 426. This is a question of law for the court. *Ellis v. Northern Star Co.*, 326 N.C. 219, 226 (1990). A practice is "unfair" if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 91 (2013). A practice is "deceptive" if it "has the capacity or tendency to deceive." *Id.*

Importantly, fraud claims "necessarily constitute a violation of the prohibition against unfair and deceptive acts." *Bhatti v. Buckland*, 328 N.C. 240, 243 (1991). Thus, a complaint that properly pleads a fraud claim automatically satisfies the unfair or deceptive element of this statutory claim. *See id.* Because the Turpins properly pleaded a fraud claim, they have pleaded this element of the unfair and deceptive trade practices claim as well.

The Turpins also allege that Charlotte Latin engaged in an unfair and deceptive practice when it "retaliated" against the Turpins for exercising their "contractually-protected right to respectfully communicate" and offered a "false, pretextual, and improper reason" for terminating the enrollment contracts. These allegations concern the parties' obligations under the contract, which we discussed in more detail above.

Conduct that amounts to a breach of contract is an unfair or deceptive practice only if there are "substantial aggravating circumstances." *SciGrip*, 373 N.C. at 426. We have taken a strict approach to evaluating substantial aggravating circumstances to prevent litigants from "repackaging" their breach of contract claims as unfair and

deceptive trade practice claims. *Value Health Sols.*, 385 N.C. at 277. This strict approach is necessary to prevent Chapter 75 of the General Statutes from inadvertently merging contract law into tort law. *See id.*

Here, the Turpins attempt to do what this Court has long prohibited. The only breach-of-contract theory on which relief can be granted is that Charlotte Latin used a false and pretextual ground to terminate the enrollment contracts. This means the use of that false and pretextual ground cannot be a "substantial aggravating circumstance" because the contract cannot be breached without that circumstance. *SciGrip*, 373 N.C. at 426. A breach of contract "standing alone, simply does not suffice to support the assertion of an unfair and deceptive trade practices claim." *Id.* at 427. Thus, although the Turpins have properly pleaded unfair and deceptive practices based on their fraud allegations, they have not done so for their other, contract-related allegations in the complaint.

Finally, the Turpins properly alleged that the unfair and deceptive acts proximately caused them injury and neither the lower courts nor Charlotte Latin have suggested otherwise. Accordingly, because the Turpins properly pleaded all the essential elements of a claim for unfair and deceptive trade practices, we reverse the Court of Appeals and remand for further proceedings on this claim.

## V.  Negligent misrepresentation

Next, we examine the Turpins' negligent misrepresentation claim. "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment

on information prepared without reasonable care by one who owed the relying party a duty of care." *Cummings v. Carroll,* 379 N.C. 347, 366 (2021). In other words, the claim arises when the defendant makes a statement that is false and, in the exercise of ordinary care, should have known it was false at the time. *Id.* Thus, "negligent misrepresentation is closely akin to fraud, differing primarily in the requisite state of mind of the purported actor." *Value Health Sols., Inc.*, 385 N.C. at 266 (cleaned up).

Here, the Turpins' negligent misrepresentation claim closely mirrors the fraud claim, relying on essentially the same allegations concerning the "no blowback" email discussed above. This similarity creates an insurmountable problem for the negligent misrepresentation claim, however. As discussed above, the allegations are based on a forward-looking promise that there would be no blowback—a promise that the Turpins allege was false when it was made.

This type of forward-looking promise cannot be the basis of a negligent misrepresentation claim. *See Rhodes, Inc. v. Morrow*, 937 F. Supp. 1202, 1215 (M.D.N.C. 1996). As explained by the Tenth Circuit in a similar circumstance, the problem is that, for a forward-looking statement to be false when it is made, the speaker must act intentionally, not negligently:

> A promise cannot serve as the predicate for a negligent-misrepresentation claim. . . . This is not some obscure technical rule. It is a natural consequence of the meanings of the terms *negligent* and *misrepresentation*. A misrepresentation conveys "false information" . . . that is, it must be a false statement of fact. But a promise in itself contains no assertion of fact other than the implied representation that the speaker intends to perform the

> promise. . . . The misrepresentation must therefore be that the promissor is falsely declaring that he has the intent to perform. If the promissor intends not to perform, however, the misrepresentation (that the promissor intends to perform) is not negligent; it is, rather, knowing and intentional.

*Alpine Bank v. Hubbell*, 555 F.3d 1097, 1107 (10th Cir. 2009) (cleaned up). Put another way, if the Turpins prove that Charlotte Latin and Ballaban *knew* the "no blowback" assurance was false at the time they made it, it is fraud. If the Turpins cannot prove the statement was false at the time, that statement cannot be fraud or negligence. Accordingly, we affirm the dismissal of the negligent misrepresentation claim.

## VI. Defamation

Next, we address the Turpins' defamation per quod claims. To plead a claim for defamation per quod, the plaintiff must allege that the defendant "caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 41 (2020) (cleaned up). In a defamation per quod claim, the "defamatory statement" is one that is "not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances" becomes defamatory. *Arnold v. Sharpe*, 296 N.C. 533, 537 (1979). A defamatory statement is "false" if "the substance, the gist, *the sting*" of the statement is untrue. *Desmond*, 375 N.C. at 67.

The factual allegations in the Turpins' complaint satisfy these pleading requirements. The Turpins allege that Charlotte Latin and Baldecchi made false

statements about the contents of the PowerPoint presentation—specifically, that the PowerPoint contained the racist assertion that minority students and faculty at the school "have not earned their positions and honors" and that those minority students and faculty were "not up to the merit of the school" like the white students and faculty; that those false statements were of and concerning the Turpins because people understood the false statements as meaning the Turpins endorsed or supported the false, racist statements; that the harmful character of these false statements to the Turpins "does not appear on its face as a matter of general acceptance, but rather becomes clear only in consequence of extrinsic, explanatory facts showing its injurious effect"; and that Charlotte Latin and Baldecchi published the false statements to third parties, causing special damages to the Turpins.

As with the earlier claims, the Court of Appeals did not take issue with the sufficiency of these factual allegations on their face. Instead, the court looked beyond the allegations in the complaint to affirm dismissal. Specifically, the court examined the contents of the PowerPoint document that is the subject of the defamatory statements. As noted above, a court may consider documents attached to a Rule 12(b)(6) motion without converting the motion into a summary judgment motion if (1) the document is referenced in the complaint, (2) the document is central to the allegations or claims asserted, and (3) there is no dispute about the document's authenticity. *See Doriety*, 109 F.4th at 679.

That is the case here. The Turpins allege that both defamatory statements

falsely claimed the PowerPoint document contained racist remarks about minority faculty and students at Charlotte Latin. Because the contents of that PowerPoint are central to this claim and no party disputes the document's authenticity, the document properly can be considered when reviewing this Rule 12(b)(6) motion although it was not attached to the complaint.

After examining the PowerPoint document, the Court of Appeals concluded that the defendants' statements were not "materially false." *See Turpin*, 293 N.C. App. at 352–53. The court first observed that the presentation expressed concern over how "weighting of DEI and Critical Theory on a 'culturally responsive education' eventually erodes the quality of student, quality of curriculum, quality of teacher and the academic rigor at the school." *Id.* The court then pointed to portions of the PowerPoint document stating that "admissions is weighting diversity over academic excellence," that Charlotte Latin was "moving away from educational meritocracy in line with progressive concepts of restorative justice and equity," and that "DEI goals" are "superseding optimizing evaluations for admitting most qualified students and hiring most qualified faculty." *Id.* (cleaned up).

Then, the Court of Appeals held that the alleged defamatory statements—that minority students and faculty at Charlotte Latin "have not earned their positions and honors" at the school and that those minority students and faculty "were not up to the merit" of their white counterparts at the school—"accurately characterize the 'gist or sting' of the Refocus Latin PowerPoint presentation." *Id.*

In other words, the Court of Appeals held as a matter of law that critiques of using "Critical Theory" in education, or establishing "DEI goals," or applying race-conscious criteria to hiring or admissions are the legal equivalent of racist comments that no minority candidate earned their position or no minority candidate is up to the standards of their white counterparts.

We reject this errant holding. The defamatory statements by Charlotte Latin do not accurately characterize the "gist" or "sting" of the PowerPoint discussion. *See Desmond*, 375 N.C. at 67. First, the only portion of the presentation referencing how the school's approach "erodes the quality of student" and the "quality of teacher" expressly addresses *all* students and faculty, regardless of color. That section of the presentation asserted that the excessive focus on "DEI and Critical Theory" was shifting the school away from a classical education teaching "objectivity," "science," "canonical reading," and so on, to instead embrace a "political and ideological agenda." When a school that was long focused on the importance of a classical education instead shifts toward a partisan, politicized curriculum, as the PowerPoint claimed, that shift impacts every student and every teacher equally. Nothing in these statements suggests the school's changed curriculum or ideological agenda negatively impacted minority students and faculty but not their white counterparts.

The remaining portions of the PowerPoint examined by the Court of Appeals are critiques of non-merit-based hiring or admissions practices and a pitch to return to a "meritocracy." Importantly, none of these statements refer to the quality or merit

of particular students or groups of students. The statements simply assert that the school should commit to a meritocracy where the driving goal is "academic excellence." Were we to adopt the Court of Appeals' reasoning with respect to these statements, it would mean any statement criticizing non-merit-based hiring or admissions practices is, as a matter of law, a statement that people who benefited from those practices would not otherwise qualify based on merit. This is a fallacy. Someone who benefits from a non-merit-based factor can still be qualified based on merit alone. The presence of that additional factor says nothing about the merit-based qualifications of the candidate.

Simply put, criticizing so-called "DEI goals" or other race-conscious criteria in hiring and admissions, and urging a return to a "meritocracy," is not the equivalent of claiming that minority students and faculty have not earned their positions and honors or are not up to the merit of other students. We do not agree that "the gist" or "the sting" of these two categories of comments are the same as a matter of law. The latter—statements focused on the purported inferiority of minority students or faculty—are pernicious and racist. They are the sort of offensive statements that, if heard by others, can damage one's reputation and good name. Accordingly, in appropriate contexts, claiming that someone made this kind of offensive statement when they did not can be defamatory. *See id.* Taking as true all the allegations in the complaint, this is one of those cases.

Our dissenting colleagues again take issue with our analysis. To them,

"allegations of racism, like many subjective viewpoints, are in the eye of the beholder and do not squarely fit into the falsity test." This is a faulty equivalence. The school did not make a subjective statement of opinion such as "the Turpins are racists." The school told its entire community of students, parents, and faculty that the Turpins *said* a specific racist thing. That claim has an objective answer: the Turpins either said it or they didn't. The correct analogy is not claiming someone is a racist, as in the cases the dissent cites, but claiming someone used a racial epithet. If that is a lie, it is defamatory. *Desmond*, 375 N.C. at 67.

As we have done with respect to other factual allegations in this divisive case, we again point out that there may be more going on factually than what is alleged in the complaint. For example, we do not yet know what the presenters said as they displayed the PowerPoint document. At this stage of the case, we can look only at the document itself. Both the school's email and Baldecchi's statements may, in full context, have been addressing matters beyond the PowerPoint document.

Courts cannot seek out this sort of full context at the pleadings stage. That is the purpose of fact discovery. *See Sutton v. Duke*, 277 N.C. 94, 106 (1970). At this early stage of the case, we take the allegations in the complaint as true and draw all reasonable inferences in favor of the Turpins. *Jones*, 387 N.C. at 492. Doing so here, the Turpins have sufficiently alleged that defendants made materially false statements. We therefore reject the reasoning of the Court of Appeals with respect to falsity.

Charlotte Latin also argues that, even if the Turpins adequately pleaded materially false statements, the defamation claims were properly dismissed because those defamatory statements were not "of and concerning" the Turpins. But once again, this argument fails because Charlotte Latin ignores the actual allegations in the complaint. As noted repeatedly above, we must view those allegations in the light most favorable to the Turpins and make every reasonable inference in the Turpins' favor. *Id.* Doing so here, the complaint properly alleges that the defamatory statements concern the Turpins.

First, the complaint alleges that Charlotte Latin made materially false statements about the content of a PowerPoint presentation. Second, the complaint alleges that a group of parents known as "Refocus Latin," including the Turpins, prepared the PowerPoint presentation. Third, the complaint alleges that Charlotte Latin knew the Turpins were part of Refocus Latin and prepared the PowerPoint presentation. Finally, the complaint alleges that, by making false statements about the content of the PowerPoint presentation, Charlotte Latin also conveyed that the Turpins themselves said or believed those false statements.

When "a statement defames a small group or class of persons in its entirety . . . any member of that class may pursue an action for defamation, despite the fact that the statement fails to specifically identify that particular individual." *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 33 (2002) (cleaned up); *see also* Restatement (Second) of Torts § 564A (A.L.I. 1976). So, for example, a juror can bring a defamation

claim based on a statement that asserted all but one member of a twelve-person jury had been bribed. *See Carter v. King*, 174 N.C. 549, 553 (1917). Likewise, each member of a four-person law firm could bring defamation claims based on a statement that the law firm committed unethical business practices. *Boyce & Isley*, 153 N.C. App. at 33.

Here, the complaint alleges a sufficiently small group of people to invoke this precedent. The Turpins allege that they formed Refocus Latin, a group of concerned parents known to the school, and that as members of that group the Turpins either prepared or presented the PowerPoint document. Again—as we have repeated many times—the Turpins will need to prove these allegations. But at this stage, they have sufficiently alleged that the statements were of and concerning them because they are members of the Refocus Latin group that prepared and presented the PowerPoint document.

Charlotte Latin also argues that, even if the complaint alleges that the *school* knew the Turpins were part of the group that prepared the PowerPoint document, the complaint does not allege that any *recipients* of the defamatory statements knew of the Turpins' involvement.

This gets at an issue inherent in this type of "per quod" claim. The false statements in this case concern the contents of a document. Documents are not defamed; people are. So the allegation in the complaint is not that the false statements are defamatory per se, but that the defamatory nature "becomes clear

only in consequence of extrinsic, explanatory facts showing its injurious effect." Specifically, the complaint alleges that there are extrinsic facts showing that the recipients of the false, racist statements about the PowerPoint would believe that the Turpins, as the creators of the document, endorsed those racist views.

We agree with Charlotte Latin that, to prove this claim, the Turpins will need to present far more evidence than is contained in the allegations in the complaint. But the complaint's failure to allege all of these extrinsic facts with particularity is not a pleading deficiency. Rule 9 of the Rules of Civil Procedure creates special pleading requirements for defamation per quod claims and requires only that a plaintiff allege the defamatory statement was "published or spoken concerning the plaintiff":

> In an action for libel or slander it is not necessary to state in the complaint any extrinsic facts for the purpose of showing the application to the plaintiff of the defamatory matter out of which the claim for relief arose, but it is sufficient to state generally that the same was published or spoken concerning the plaintiff, and if such allegation is controverted, the plaintiff is bound to establish on trial that it was so published or spoken.

N.C.G.S. § 1A-1, Rule 9(i)(1).

As noted above, the Turpins included allegations that the defamatory statements were published concerning them. The extrinsic facts needed to prove the truth of this allegation need not be pleaded; that is a matter for summary judgment or trial. *Id.*

We close by noting that we allowed discretionary review of the Turpins'

defamation claims primarily to address the errant Court of Appeals reasoning concerning falsity. We therefore limit our review to that issue, and to the additional "of and concerning" issue expressly raised by Charlotte Latin in its briefing. We acknowledge that the Turpins' defamation per quod claims involve a number of complex legal issues and the law of per quod claims is not well-developed in our jurisprudence. Our opinion addresses only the issues presented to us by the parties or examined by the lower courts and should be understood as limited to those issues.

## VII.  Negligent infliction of emotional distress and negligent retention

Finally, we turn to the Turpins' claims of negligent infliction of emotional distress and negligent retention. The Court of Appeals affirmed dismissal of these two claims for failure to state a claim on which relief can be granted. *Turpin*, 293 N.C. App. at 351, 354. The Court of Appeals' analysis with respect to these two claims was among the lengthy list of issues presented in the Turpins' petition for discretionary review. We allowed the petition in its entirety to ensure that we had jurisdiction over the many matters warranting discretionary review in this multi-claim case.

Upon further review of these two specific claims, we agree with Charlotte Latin that they fail to state a claim on which relief can be granted for a number of reasons that are well-settled in this state's tort jurisprudence. Those claims also do not involve documents not attached to the complaint or the incorporation-by-reference doctrine that we adopted above. Thus, we are not persuaded that these claims involve

matters where there is any conflict in our jurisprudence, or where there are issues sufficiently significant to meet the standard for discretionary review. We therefore dismiss our review of these issues as improvidently allowed without addressing or endorsing the reasoning of the Court of Appeals decision.

## Conclusion

We reverse the decision of the Court of Appeals in part as to the properly pleaded claims for breach of contract, fraud, unfair and deceptive trade practices, and defamation, and we remand for further proceedings on those claims. We conclude that discretionary review was improvidently allowed as to the remaining issues.

REVERSED AND REMANDED IN PART; DISCRETIONARY REVIEW IMPROVIDENTLY ALLOWED IN PART.

Justice RIGGS concurring in part and dissenting in part.

North Carolina, like much of the country, is currently hosting vigorous debate on the role of private schools in educating our children and the need to address diversity and inclusion in our schools. While this case does not invite us to dive into either of those debates, we must ensure that the rules that emerge from this Court are applied uniformly, no matter the kind of private schools at issue. As the Roman Catholic Diocese of Charlotte and the North Carolina Association of Independent Schools and Southern Association of Independent Schools pointed out in their amicus briefs, the result the plaintiffs seek here would open the door to litigation against all private schools. I doubt that is the majority's intent, but while the rule emerging from this Court today is erroneous, it will need to be applied evenhandedly: schools with different ideologies cannot be treated differently than Charlotte Latin here.

I agree with the majority's dismissal of the negligent misrepresentation claim and dismissal of review of the negligent infliction of emotional distress and negligent retention claims as improvidently allowed. However, we should have also affirmed the dismissal of the breach of contract, fraud, and defamation claims. Therefore, I respectfully dissent.

## I. The breach of contract and fraud claims do not survive Charlotte Latin's 12(b)(6) motion to dismiss because the Turpins' arguments relating to pretext fail as a matter of law.

Addressing the breach claim first, to state a claim for breach of contract, the

plaintiff must allege "(1) the existence of a contract between plaintiff and defendant, (2) the specific provisions breached, (3) the facts constituting the breach, and (4) the amount of damages resulting to plaintiff from such breach." *Intersal, Inc. v. Hamilton*, 373 N.C. 89, 108–09 (2019) (cleaned up). When deciding cases arising from a 12(b)(6) motion to dismiss, "we must take the complaint's factual allegations as true." *Morris v. Rodeberg*, 385 N.C. 405, 406 (2023) (citing *Blue v. Bhiro*, 381 N.C. 1, 2 (2022)). Here, even taking all facts in the complaint as true, the Turpins failed to sufficiently allege facts constituting breach of contract as a matter of law.

As a preliminary matter, I agree with the majority's treatment of the materials outside of the four corners of the complaint. *See* majority *supra* Parts I, II. The majority correctly concludes that both the Enrollment Agreement (EA) and the Parent-School Partnership (PSP) can be incorporated by reference in the consideration of a motion to dismiss. However, while the majority goes on to then interpret the contract as a part of its 12(b)(6) analysis, it misreads the documents, particularly the termination provision in the PSP. The EA provides that "I understand that a student's attending the School is a privilege and not a right, and that, in all cases, the School retains the right to determine, in its sole discretion, whether or not to select a student for admission or to re-enroll a student." The PSP, incorporated into the EA, allows Charlotte Latin to terminate a student's enrollment at any time, in its discretion, based on parental behavior. The termination provision reads:

> A positive, collaborative working relationship between the School and a student's parent/guardians is essential to the fulfillment of the School's mission. Therefore, the School reserves the right to discontinue enrollment if it concludes that the actions of a parent/guardian make such a relationship impossible or seriously interfere with the School's mission.

Under both provisions, Charlotte Latin has broad, and indeed, near unfettered discretion to terminate a student's enrollment.

Obviously, any school enrollment contracts that vest the schools with such unfettered rights are still subject to controlling state and federal law. *See, e.g.*, N.C.G.S. § 115C-556 (2025) (requiring "qualified nonpublic" schools to abide by certain health and safety regulations); *id.* § 115C-548 (requiring religious private schools to abide by certain health and safety regulations); 42 U.S.C. § 2000d (prohibiting racial discrimination in private schools receiving federal funding). But, unlike public schools, private schools enter into contractual agreements with parents that set out terms for a child's enrollment. In forming these contractual relationships, parents and schools enjoy the freedom of contract. *See, e.g.*, *Hlasnick v. Federated Mut. Ins. Co.*, 353 N.C. 240, 243 (2000) ("Indeed, our state's legal landscape recognizes that, unless contrary to public policy or prohibited by statute, freedom of contract is a fundamental constitutional right."); *Am. Tours, Inc. v. Liberty Mut. Ins. Co.*, 315 N.C. 341, 350 (1986). Parents may negotiate for different terms, including narrower termination clauses, and private schools have the right to establish their own set of rules. *Teeter v. Horner Mil. Sch.*, 165 N.C. 564, 568 (1914)

(reasoning that a private school "had the undoubted power to adopt and enforce suitable rules and regulations for the government and management of the school"); *see Canteen v. Charlotte Metro Credit Union*, 386 N.C. 18, 25 n.5 (2024) ("While lay consumers may not understand every legal intricacy involved in the contractual process with companies, the market provides a way for consumers to respond to policies with which they disagree. As needs arise, competitor companies can provide alternatives for consumers, forcing improvements or updates to products or services . . . .").[1] Parents are under no obligation to enroll their children at a particular private school—they may choose to accept the private school's contractual terms (and enroll their children) or reject the terms (and enroll their children elsewhere). *See Brenner v. Little Red Sch. House, Ltd.*, 302 N.C. 207, 213 (1981) (reasoning that "[t]here was no inequality of bargaining power" between parents and a private school because "Plaintiff was not forced to accept defendant's terms, for there were other private and public schools available to educate the child").

The reality is that private schools, founded on the freedom to contract and

---

[1] In *Canteen*, the majority rejected the dissent's argument that "unrestricted unilateral amendment clauses," where a credit union could make whatever changes to a consumer contract it saw fit under the expansive rights it reserved for itself, would render that contract illusory. 386 N.C. at 26–27. Here, although acknowledging the rule from *Canteen*, the majority fails to adequately distinguish Charlotte Latin's termination clause from the permissible unilateral change provision in *Canteen*. The majority here just asserts without explanation that the unilateral power reserved by Charlotte Latin is different than the unilateral power reserved by Charlotte Metro Credit Union. It cannot be correct, under contract law, that defendant private schools are somehow bound to treat the consumers of their product better or more generously than defendant credit unions are required to treat their customers.

associate, are *allowed* to not tolerate differing viewpoints or independent thought. As long as they do not violate state or federal law or seek to enforce contracts in convention of public policy, private schools may terminate enrollments based on political ideology—and if parents are unhappy, they may exercise the right to contract with a different school that better aligns with their preferences or send their children to public schools, where the freedom to contract does not vest the school administrators with such unfettered discretion.[2] To the extent that the complaint alleges that any reason Charlotte Latin gave for the termination was pretext, and that the children's enrollment was terminated because of "cancel culture," Charlotte Latin was allowed to do exactly that under the broad discretion it retained under the contract.

The PSP and EA expressly provided for unilateral termination at Charlotte Latin's sole discretion, whenever Charlotte Latin determined that the parent-school relationship was untenable. The majority concedes that exactly this sort of unilateral clause is permissible under *Canteen*. *See* majority *supra* Part II. Per the plain language of both the PSP and the EA, the determination of the unworkability of the parent-school relationship is entirely the school's decision to make—despite the majority's cursory attempt to distinguish *Canteen*, this is the same sort of unilateral authority retained by one of the contracting parties. The Turpins exercised the right

---

[2] That private schools retain the right to enforce orthodoxy with their viewpoints is one of the central policy arguments against public funding of private schools.

to contract and agreed to abide by the termination clause in the contract when they chose to enroll their children at Charlotte Latin. In doing so, they agreed to give Charlotte Latin broad discretion over whether, when, and why to terminate their children's enrollment. The Turpins could have negotiated for a clause limiting Charlotte Latin's unilateral ability to terminate the enrollment agreement. They did not. Instead, Charlotte Latin retained the unilateral discretion to terminate the children's enrollment whenever it decided the relationship was untenable—including if it believed the Turpins' political beliefs were inconsistent with the school's values.

The Turpins allege that the EA obligated Charlotte Latin to educate their children and comply with the PSP in exchange for the Turpins paying tuition and complying with the PSP. They claim that Charlotte Latin breached this contract in three ways: (1) expelling their children in violation of Charlotte Latin's promise to educate them, (2) expelling the children without procedural protections in violation of an alleged promise to "uphold and enforce rules and policies detailed in the Family Handbook in a fair, appropriate and equitable manner," and (3) expelling the children in retaliation for the Turpins' communications in violation of Charlotte Latin's promises involving communication. The majority rightly rejects the alleged contractual rights to procedural protections and communication but should have also rejected the Turpins' first breach theory. *See* majority *supra* Part II. Even from the face of the complaint and taking as true all the facts alleged, Charlotte Latin retained the sole and entire discretion to determine that the relationship could not continue.

The Turpins made no allegations that Charlotte Latin's decision to terminate enrollment was based on a prohibited discriminatory basis.[3] Instead, Charlotte Latin exercised its discretion under the express terms of the contract when it terminated the children's enrollment. The Turpins failed to demonstrate any facts evincing breach, so the breach of contract claim should have been dismissed.

For both the fraud and the breach of contract claims, the Turpins argue that Charlotte Latin provided pretextual reasons to terminate their children's enrollment. However, the contract did not prohibit pretextual termination, as long as Charlotte Latin believed in its sole discretion that the parent-school relationship was untenable. This is true even if the relationship was untenable because of "cancel culture." So, even taking the facts in the complaint as true and assuming that Charlotte Latin did terminate the children's enrollments for pretextual reasons, the Turpins fail to plead illegal grounds for termination and therefore establish neither fraud nor breach of contract.

Put another way, as the majority references, the Turpins' complaint repeatedly invokes the term "pretext," but neither the complaint nor the majority is clear what impermissible reason the alleged pretext masked. *See* majority *supra* Part II ("But, the Turpins allege, the school was determined to retaliate against them for other reasons and used the contractual grounds as the false pretext to do so."). What were

---

[3] For example, if private schools receive federal funding, they cannot discriminate on the basis of race, color, or national origin. 42 U.S.C. § 2000d.

the other reasons? Those reasons matter—the term "pretext" is not some shibboleth that automatically guarantees survival of a 12(b)(6) motion.

Whether Charlotte Latin terminated the children's enrollment because it did not like how the Turpins were communicating with the school, it disagreed with how the Turpins sought to shape curriculum to match their political beliefs, or for any other reason not prohibited by anti-discrimination laws, both the EA and PSP allowed the children's enrollment to be terminated in Charlotte Latin's sole discretion, based on Charlotte Latin's sole perception of the future tenability of the parent-school relationship.[4] Charlotte Latin was permitted to terminate the contract whenever it decided a positive, collaborative working relationship was impossible, and it did so here, regardless of whether its proffered reason of communication was pretext for simply disliking the Turpins' views. Charlotte Latin was entitled to determine that either reason was sufficient to discontinue enrollment.

---

[4] To the extent that Charlotte Latin conceded in oral argument that it could not terminate the children's enrollment in bad faith, as a matter of law, what was alleged in the complaint did not establish any kind of bad faith action prohibited by the contract. For example, the majority points out that Charlotte Latin explained in briefing that it could not discontinue enrollment if it just wanted to get out of a "bad deal." *See* majority *supra* Part II. But Charlotte Latin's point was that the complaint did not allege that Charlotte Latin just wanted to get out of a bad deal, or charge the Turpins more, or anything that would actually be impermissible under the contract. Despite invoking the term "pretext" frequently, the Turpins did not allege that Charlotte Latin terminated the children's enrollment for any reason other than its sole determination that a positive relationship with the Turpins was "impossible." That the term "impossible" was not defined in the contract does not give more weight to the unexplained and vague accusations of "pretext." Even if Charlotte Latin determined the relationship was untenable because it disagreed with the method of the Turpins' communication, or as the Turpins might think, because the school did not like the Turpins' views, the school's decision was fully permitted by the termination clause in either case and, thus, the termination could not be made in bad faith for those reasons.

"Dismissal under Rule 12(b)(6) is warranted only when (1) it appears certain that plaintiffs could prove no set of facts which would entitle them to relief under some legal theory; (2) no law exists to support the claim made; or (3) the complaint on its face discloses facts that necessarily defeat the claim." *Howell v. Cooper*, 388 N.C. 71, 78 (2025) (emphasis omitted). Here, because the supposed pretext was not prohibited by law or the contract itself, even assuming arguendo that Charlotte Latin terminated the children's enrollment for pretextual reasons, "no law exists" to support the Turpins' breach of contract claim. *Id.* Further, since the EA and PSP are incorporated by reference into the complaint and contain termination clauses that justify termination in Charlotte Latin's sole discretion, the complaint by reference discloses facts that necessarily defeat the Turpins' breach of contract claim. For those reasons, the Turpins' breach of contract claim was properly dismissed under 12(b)(6), and the majority should have affirmed the Court of Appeals' holding.

Similarly, the Turpins' claim that the termination was fraudulent because it was pretextual is meritless. To state a claim for fraud, the complaint must allege: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 9 (2018). Additionally, fraud has a heightened pleading standard, requiring that "the circumstances constituting fraud . . . shall be stated with particularity," N.C.G.S. § 1A-1, Rule 9(b) (2025), including "time, place and content of the fraudulent

representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 263 (2023) (quoting *Terry v. Terry*, 302 N.C. 77, 85 (1981)).

The Turpins allege that Charlotte Latin committed fraud by concealing material facts and making false representations, specifically that teachers would not retaliate against the children and that a 10 September 2021 meeting to discuss the Turpins' son's curriculum would be an opportunity for school officials to "answer and/or address" the Turpins' concerns. The Turpins claim that

> [T]he September 10, 2021 meeting was designed by Baldecchi and Ballaban to provoke Mr. and Mrs. Turpin into saying or doing something that would violate the Parent-School Partnership and, thus, justify Baldecchi expelling their children and/or to falsely accuse them of having violated the Parent-School Partnership in the past.

As part of that plan, the Turpins allege that Charlotte Latin officials sought to deceive the Turpins and "lure" them into the meeting:

> In actuality, Baldecchi and Ballaban scheduled the [10 September 2021] meeting in order to lure Mr. and Mrs. Turpin into a meeting that had the objective of intentionally agitating Mr. and Mrs. Turpin to the point that Baldecchi could justify expelling their two children and/or to falsely accuse them of having violated the Parent-School Partnership in the past.

The Turpins claim that Mr. Turpin attended the meeting in reliance on the false representations and concealed facts. The complaint further alleges that he "communicated with Ballaban [at the meeting] with respect, courtesy, and dignity

throughout Ballaban's response to Mr. and Mrs. Turpin's concerns regarding their son's education, in the spirit of a positive, collaborative working relationship as is consistent with Latin's Mission" and that his words, tone of voice, and volume were "professional and civil."

The Turpins allege that despite Mr. Turpin's civility at the meeting,[5] a Charlotte Latin official expelled the children "because he disliked the manner in which Mr. Turpin had communicated to Latin about Mr. and Mrs. Turpin's concerns about their children's education, including Latin's recent change in curriculum and culture and its focus on a political agenda." The Turpins allege that this stated reason was "false, pretexual, and improper" because "respectfully communicating with Latin is contractually-protected activity under the Parent-School Partnership," so the expulsions were actually retaliation for the Turpins' "exercise of their contractually-protected right to respectfully communicate with Latin about their children's education."

However, while the Turpins' fraud claim relies on the notion that Charlotte Latin's stated reason for terminating the children's enrollment must be pretextual because the Turpins had a contractual right to communicate, the majority is clear and correct that "[t]he contract does not contain [this] right[ ]." *See* majority *supra* Part II. Without the contractual right to communicate, the Turpins' fraud claim

---

[5] The Turpins' fraud claims have a logical inconsistency: they allege they were provoked to become agitated and to act in a manner that would violate the PSP, but then the Turpins claim to have acted with civility. Both cannot be true.

collapses—Charlotte Latin's claim that it terminated the children's enrollment because the Turpins' communication made the relationship untenable is squarely within the bounds of the termination clause. Charlotte Latin did not need a pretextual reason to terminate the agreement, since the contract expressly permitted it to terminate the children's enrollment in its sole discretion when it decided the relationship was untenable, as the Turpins admit it did here. Rather than creating an unnecessary and fraudulent pretext to terminate the children's enrollment, Charlotte Latin simply exercised its contractual rights.

Even assuming arguendo that Charlotte Latin terminated the children's enrollment because its administrators found the Turpins' viewpoints on diversity and equity to be loathsome, rather than finding how the Turpins communicated to be in violation of the PSP, it matters not: either reason is an acceptable reason under the contract for Charlotte Latin to terminate its relationship with the Turpins and their children. And even assuming Charlotte Latin *did* intend to terminate the enrollment agreement for pretextual reasons, under the terms of the contract, there is no reason why Charlotte Latin would not be able to do so. Under the terms of the EA and PSP, incorporated by reference into the complaint, Charlotte Latin did not need to manufacture permission to terminate the children's enrollment. Even with a pretextual reason for the 10 September meeting, Charlotte Latin was fully within its rights to terminate the agreement if it believed the relationship was "impossible," and such termination could not have been fraudulent under any interpretation of the

facts.   Charlotte Latin's reservation of its rights in the contract was that expansive.

Additionally, the Turpins claim that Mr. Turpin attended the meeting and was unprepared to address Charlotte Latin's allegation that his conduct violated the PSP, so he relied on the alleged misrepresentation and was therefore harmed when Charlotte Latin terminated his children's enrollment.  However, even taking as true that Mr. Turpin attended a meeting for which he was unprepared, such reliance does not prove fraud, since Charlotte Latin could terminate his children's enrollment regardless of whether he attended the meeting, rebutted any claims, or even violated the PSP.  *See Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 452 (2015) (affirming dismissal of several claims including fraud because plaintiffs failed to allege actual reliance and defendant's action was not the proximate cause of the alleged injury); *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 32 (2003) (rejecting fraud claim because, even if concealed information had been disclosed, it "would not have been material" to plaintiff's outcome).   Under the terms of the contract, Charlotte Latin could terminate the enrollments without a meeting, or without regard to Mr. Turpin's civility at a single meeting, if it believed in its sole discretion the relationship had become untenable.   Since Charlotte Latin could unilaterally terminate the enrollment agreement, regardless of whether Mr. Turpin relied on the allegedly pretextual justification for the meeting, he has only alleged that Charlotte Latin exercised its contractual rights, not that it committed fraud. Therefore, the fraud claim was properly dismissed below, and the majority should

have affirmed the Court of Appeals' decision.[6]

## II.  The defamation claim does not survive Charlotte Latin's 12(b)(6) motion to dismiss because the Turpins failed to adequately allege falsity.

In their complaint, the Turpins allege that Charlotte Latin committed defamation *per quod* by making statements indicating that the Refocus Latin presentation,[7] in which the Turpins participated, contained statements that "the school accepts students and hires faculty because of their color" and that those students and faculty "are also not up to the merit of the school."  The Turpins also claim that Charlotte Latin sent an email to all families, faculty, and staff with the allegedly defamatory statement that "Furthermore, the Board categorically rejects the assertion that diverse students and faculty have not earned their positions and honors at Latin and that diversity comes at the expense of excellence."

To adequately allege a claim for defamation *per quod*, "a plaintiff generally must show that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 41 (2020) (cleaned up).  Unlike defamation *per se*, defamation *per quod* involves statements "which are

---

[6] As to the unfair and deceptive trade practices (UDTPA) claim, the majority is correct that if a plaintiff has sufficiently alleged fraud, the UDTPA claim should survive.  However, if a plaintiff's breach of contract claim survives, the substantial aggravating factors pleading requirement should be treated as generously as the notice pleading requirement.  Since neither the fraud claim nor the breach claim are adequately pleaded here, the majority should have affirmed the dismissal of the UDTPA claim.

[7] The majority correctly incorporates the PowerPoint presentation by reference into the complaint.

not obviously defamatory, but which become so when considered in connection with innuendo, colloquium and explanatory circumstances." *Ellis v. N. Star Co.*, 326 N.C. 219, 223 (1990) (quoting *Flake v. Greensboro News Co.*, 212 N.C. 780, 785 (1938)). Here, the Turpins failed to adequately allege that Charlotte Latin's statements were false. And, while the majority limits its opinion to the issues of falsity and whether the statements were "of and concerning" the Turpins, the complaint's allegation of publication also raises questions of how to defend against defamation claims at the 12(b)(6) stage.

The Turpins allege that Charlotte Latin made known false statements characterizing the Refocus Latin presentation as stating that minority faculty and students at Charlotte Latin were not qualified for their roles, were hired or admitted based on racial preferences, and that Charlotte Latin conducts hiring and admissions in violation of federal law. The majority claims that Charlotte Latin's statements mischaracterize the PowerPoint document, and that "[t]he school also falsely accused the Turpins of making racist comments about non-white students and faculty." *See* majority *supra* Introduction, Part VI. Plaintiffs "must establish that 'the sting,' the aspect causing injury to plaintiff's reputation, is materially false." *Desmond*, 375 N.C. at 67. "[T]he issue of falsity relates to the *defamatory* facts implied by a statement." *Id.* (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 n.7 (1990)). Here, the core of the defamatory statements, and the "sting" allegedly harming the Turpins' reputation, is that they made racist statements during the Refocus Latin

presentation.

The majority argues that the Turpins adequately alleged that Charlotte Latin's statements, asserting that the Turpins made racist statements, were false. *See* majority *supra* Part VI. However, allegations of racism, like many subjective viewpoints, are in the eye of the beholder and do not squarely fit into the falsity test. How could a plaintiff prove that a statement alleging he expressed a particular viewpoint is false? How can a defendant prove that it is true?

"[A] statement of . . . public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich*, 497 U.S. at 20. Consider the examples in *Milkovich*: while a statement like, "In my opinion Mayor Jones is a liar," is provable and therefore not protected, a statement that is not provable, such as, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," is not capable of truth or falsity, so "would not be actionable." *Id.* In the marketplace of ideas, where First Amendment doctrine seeks to ensure that "debate on public issues remains 'uninhibited, robust, and wide-open,'" statements that cannot be proven false are protected. *Id.* (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)).

While this Court has not established the contours of opinion statements that cannot be proven and thus are not actionable in defamation cases, both the Court of Appeals and the Fourth Circuit have held that opinions are protected speech that cannot support a defamation claim and identified examples thereof. *See Daniels v.*

*Metro Mag. Holding Co., L.L.C.*, 179 N.C. App. 533, 539 (2006) ("Rhetorical hyperbole and expressions of opinion not asserting provable facts are protected speech"); *Lewis v. Rapp*, 220 N.C. App. 299, 305 (2012) (determining whether a statement "was merely an opinion on a matter of public concern" because "[i]f it was, then defendant is not liable for defamation and the inquiry ends"); *Snyder v. Phelps*, 580 F.3d 206, 218 (4th Cir. 2009) (stating that "although there is no categorical constitutional defense for statements of opinion, the First Amendment will fully protect statements that cannot reasonably be interpreted as stating actual facts about an individual" (cleaned up)). And while caselaw is scarce and "there appears to be no North Carolina court expressly addressing this issue, many courts in other jurisdictions that have faced the issue of defamation claims based on accusations of bigotry or racism have held the statements to be nonactionable statements of opinion." *Squitieri v. Piedmont Airlines, Inc.*, No. 3:17CV441, 2018 WL 934829, at \*4 (W.D.N.C. Feb. 16, 2018) (not reported) ("Statements indicating that Plaintiff is racist are clearly expressions of opinion that cannot be proven as verifiably true or false.").

The Turpins make the conclusory statement that Charlotte Latin's statements are false, but they do not explain how Charlotte Latin's subjective interpretation that the Refocus Latin presentation was racist could be false. The majority fails to analyze whether the alleged defamatory statement is a fact, which can be false, or an opinion, which cannot. Charlotte Latin's email, about which the Turpins complain and that they infer is made in reference to them, states that parents complained "that diverse

students and faculty have not earned their positions and honors at Latin and that diversity comes at the expense of excellence." Complaint at 22, *Turpin v. Charlotte Latin Schools, Inc.*, No. 22-CVS-6443 (N.C. Super. Ct. April 25, 2022). It is a faulty equivalence to suggest this actual statement, a reflection of values and opinion that the school rejected, is more like "claiming someone used a racial epithet" than "claiming someone is a racist." *See* majority *supra* Part VI.[8] Instead, the crux of the Turpins' defamation claim is that Charlotte Latin, in characterizing the Refocus Latin presentation, portrayed them in a negative light. This is an entirely subjective inference, which does not lend itself to the falsity analysis. Even with the low notice pleading standard, the Turpins must state a legally cognizable claim—which they cannot do if the alleged defamatory statement is an opinion incapable of falsity.

As a matter of law, allegations of racism should be treated as unprovable opinion, not fact, as they are in other jurisdictions. *See, e.g.*, *Stevens v. Tilman*, 855 F.2d 394, 402 (7th Cir. 1988) (holding that an allegation of racism "is not actionable unless it implies the existence of undisclosed, defamatory facts"); *Murphy v. Rosen*, 329 A.3d 913, 916 (Conn. 2025) (joining "numerous other jurisdictions" to hold that an allegation a person was a "white supremacist" was "not objectively verifiable" so was a non-actionable opinion); *Cousins v. Goodier*, 283 A.3d 1140, 1157–58 (Del. 2022)

---

[8] The majority's reliance on *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21 (2020), does not actually advance its cause. *Desmond* was a much more nuanced case than the instant one, coming after a jury trial. The *Desmond* Court found no error in jury instructions, "considered and reviewed in their entirety," in a situation where plaintiff alleged falsity in both attribution and the underlying statement. *Id*. at 66–67.

(holding that an allegation of racism was not "provably false" and that "the First Amendment is clear that [determining what it means to be racist] would be the opposite of our role"); Liam H. McMillin, *Proving Racism: Gibson Bros. Inc. v. Oberlin College and the Implications on Defamation Law*, 90 U. Cin. L. Rev. 1021, 1030–36 (2022). The majority entirely fails to engage with the enormous body of law and literature around the First Amendment implications of permitting defamation claims for allegations of racism. The Turpins have not adequately alleged falsity here because they cannot do so—opinions can be neither true nor false. Instead, as protected speech, a subjective opinion that another person expressed a racist viewpoint cannot form the basis of a defamation claim. Without an allegation whose truth or falsity is capable of proof, the Turpins have not alleged defamation, and the claim should have been dismissed. I fear this superficial treatment of the limitations on the use of state defamation law to constrain free speech will have significant chilling effects on important public discourse and will fling open the courthouse doors to disputes that should be settled in open, public conversations, not by judges.

Further, while the majority limits its opinion to only falsity and whether the statement was "of and concerning" the Turpins, I am also skeptical that the complaint's publication allegation survives as a matter of law. The Turpins separately allege slander *per quod* and libel *per quod*. For slander *per quod*, the Turpins claim that the allegedly defamatory statement was "uttered on September 10, 2021 in the physical presence of Ballaban, a third party" and that "[u]pon

information and belief, Baldecchi's Defamatory Statement was uttered between September 10, 2021 and September 14, 2021 to one or more of the other Board Defendants, who are third parties." Even assuming that the falsity and "of and concerning" prongs are satisfied, and they are not, the allegation in the slander *per quod* claim that the statement was made to an unspecified someone over a multi-day span is unacceptably vague and should not form the basis for publication. It is not clear how a defendant could ever succeed at the 12(b)(6) stage if all a plaintiff needs to do is allege that a statement was made somewhere, to someone.[9] Under the notice pleading standard, we must take this factual allegation as true, even as vague as it is. *Morris*, 385 N.C. at 406. But how vague is too vague to survive under Rule 12(b)(6)? Do we permit every vague statement, merely because we must assume that it is true? How would defendants put on a defense if they are not on notice of the identity of the person or persons to whom they allegedly published the defamatory statement? While publication may be met here on other grounds, the broader allegations present a serious issue for defendants seeking to dismiss vague and meritless claims at the 12(b)(6) stage, and this Court should clarify specificity under the notice pleading requirements.

Because I would have affirmed the dismissal of the breach of contract, fraud,

---

[9] If the publication allegation is simply that the statement was made in the presence of Mr. Ballaban, then this one prong of the test may be satisfied. *See Bouvier v. Porter*, 386 N.C. 1, 10 (2024) (listing as an element of defamation that a plaintiff must prove the defendant's defamatory statements "were published to a third person").

and defamation claims, I respectfully dissent.

Justice EARLS joins in this concurring in part and dissenting in part opinion.